# Exhibit 1

SAP IS FOR GREAT COMPANIES, NOT JUST GREAT BIG COMPANIES. ▲ VIEW CUSTOMER SUCCESSES    SAP


BusinessWeek

keyword or company    Search
Register | Sign In

Current Issue
4 Free Issues
Subscribe Now

Get Four
Free Issues

Register

Subscribe to BW

Customer Service

Full Table of Contents
Cover Story
Personal Finance
Up Front
Readers Report
Voices of Innovation
Technology & You
Media Centric
Business Outlook
The Business Week
News: Analysis &
Commentary

Global Business
Finance
Legal Affairs
Special Report
Social Issues
Marketing
Environment
Sports Biz
People
Executive Life
Inside Wall Street
Figures of the Week
Ideas -- Books
Ideas -- Face Time with
Maria Bartiromo
Ideas -- The Welch Way

PREMIUM CONTENT
MBA Insider

BW MAGAZINE
Get Four Free Issues
Register
Subscribe
Customer Service

ONLINE FEATURES
Book Reviews
BW Video
Columnists
Interactive Gallery
Newsletters
Past Covers
Philanthropy
Podcasts
Special Reports

MAY 1, 2006
LEGAL AFFAIRS

▶ Back to Main Story

## McKINSEY'S FIVE-STEP PROGRAM

In one of its presentations to Allstate, the management consultant predicted that Allstate could reduce auto payouts by 5% to 15% and expenses by 10% to 20% if managers took the following steps:

**1 GETTING BEHIND THE PROGRAM** "The senior management team views the improvement program as a top priority."

**2 ELIMINATING SACRED COWS** "They are willing to make fundamental changes in people, procedures, management systems, structure."

**3 BEING IN FOR THE LONG HAUL** "They stick with it for several years until a changed culture is put in place."

**4 SPREADING THE WORD** "They focus extraordinary attention on communication throughout the organization."

**5 MEASURING THE RESULTS** "They invest significant time in measuring their performance."

BW MALL  SPONSORED LINKS

Trade the US Dollar FOREX trading - Mini Accounts from $250 - Free Practice Account.

Private Student Loans $1,000 - $100,000 Instant decision loans for tuition, rent, books, etc. Pay after graduation. Low APR.

Refinance Your Mortgage - All Credit Welcome Get Up To 4 Free Quotes - 1 Quick & Easy Form. No Credit Check or SS#. All Credit Welcome.

Refinance & Lock In A Low Rate Now $200k Refinance for $583/month. Compare Up To 4 Refinance Quotes Fast.

AARP & The Hartford Over 50 Auto Insurance. Over 50? Save $303 On Fast, No Hassle Lifetime Renewability Auto Insurance With AARP. Official Site!

Buy a link now!



▶ Close Window

MAY 1, 2006

LEGAL AFFAIRS

# In Tough Hands At Allstate

It's fighting accusations that its methods deny policyholders legitimate benefits

David Berardinelli is something of a bon vivant. The Santa Fe (N.M.) plaintiffs' lawyer collects fine wine, has chefs from local restaurants over to cook in his home, and restores classic Porsches. He's also about to become a published author.

His book, *From Good Hands to Boxing Gloves*, won't burn up the best-seller lists. But it's already making waves. It tells the story of the key role played by management consultant McKinsey & Co. in reengineering auto insurance claims operations at Allstate Corp. (ALL) -- and it's a story Allstate doesn't want told.

In February, a New Mexico state court rejected Allstate's efforts to keep Berardinelli from publishing his book, which will be marketed to trial lawyers nationwide later this year. Since 2004, Allstate has been defying an order by the same court to make available public copies of some 12,500 PowerPoint slides McKinsey prepared for the insurer, which form the basis of the book. That's quite unusual -- big companies almost never ignore judicial orders. In a court filing, Allstate has characterized its actions as "respectful civil disobedience."

What is it that Allstate so badly wants to keep under wraps? In a written response to *BusinessWeek*, the insurer says the McKinsey material contains proprietary business secrets. The documents also present a clear risk to the company's reputation. The title of Berardinelli's book is drawn from a McKinsey slide that suggests that Allstate should treat some of its claimants with "boxing gloves," rather than with its trademark "good hands." Collectively, the documents present a portrait of business strategies that are at odds with the insurer's carefully cultivated public image. Rather than simply rushing to the scene of an accident and doling out cash, Allstate deploys a variety of systems set in place by McKinsey to make sure it pays the minimum necessary -- and it plays hardball with those who seek more.

Berardinelli, 57, has provided *BusinessWeek* an exclusive copy of a draft of the book, as well as more than 200 typed pages of notes he took on the McKinsey slides. His tale illuminates the largely hidden role McKinsey has played as a key architect of claims practices in use across the insurance industry today. In addition to advising Allstate, McKinsey has also done work for Farmers Insurance Group, USAA, State Farm, and Fireman's Fund (AZ). While many of the cost-reduction strategies McKinsey recommended at Allstate remain in place, some have been reined in following legal and regulatory challenges in several states.

EPIC WAR

Berardinelli's book is certainly a partisan one, written to support "bad faith" lawsuits that he and other attorneys have filed against Allstate alleging mistreatment of policyholders. He says that the McKinsey project, which lasted from 1992 until at least 1997, institutionalized aggressive practices aimed at enriching investors at the expense of customers. "When you strip away all the fancy jargon, all this is a plan for switching money from the policyholders' pockets to the shareholders' pockets," he maintains. In the decade after Allstate instituted the McKinsey program in 1995, the amount of money it paid out per premium dollar in car accident cases declined from about 63 cents to 47 cents, according to A.M. Best.

Mckinsey declined to comment, citing client confidentiality. But Allstate says Berardinelli's allegations are "unfounded and unproven." Rather than trying to cheat customers, the company says, its claims revamp was just good management: an effort to "become the premier claim organization in the industry." A major goal, it says, was to benefit policyholders by identifying "exaggerated and fraudulent claims." In its written response, Allstate further said its "processes are absolutely sound" and that its goal is "to investigate, evaluate, and promptly resolve each claim fairly, based on the merits."

The battle over the McKinsey documents is just the latest round in an epic, decades-long war between insurers and the plaintiffs' bar over access to one of the biggest treasure troves of cash ever created: the billions of dollars in premiums held by insurers to pay claims. For years, each side has cast the other as evil incarnate. In the early 1990s, when Allstate retained McKinsey, there was a widespread sense among insurers that they were paying too many illegitimate automobile-accident claims and that an aggressive plaintiffs' bar, fueled by a wave of newly allowed attorney advertising, bore much of the blame. One focus of the program McKinsey introduced at Allstate, called

Claim Core Process Redesign (CCPR), was aimed at striking a blow at that trend.

But plaintiffs' attorneys around the country allege that various elements of CCPR go beyond eliminating fraudulent claims and operate in a systematic way to deny policyholders legitimate benefits. Copies of Allstate's massively thick CCPR manuals have been circulating among trial lawyers for years. Although plaintiffs have had piecemeal success in bad-faith cases against Allstate, the insurer points to seven court rulings that have rejected attacks on CCPR. Last December a Montana state court noted that while CCPR practices may be illegal "if misapplied in a particular case, they nevertheless are neutral with no manifestly illegal purpose."

Berardinelli is convinced that the McKinsey material could turn the tide. The documents "explain why McKinsey built CCPR," he says. In his book he compares Allstate to a vendor of canned peas and argues that the documents "show how McKinsey...deliberately designed Allstate's claim factory to arbitrarily 'underfill' every can of Allstate insurance."

He begins his story in 1992, when, Berardinelli believes, McKinsey made its initial presentations on the Allstate project. (Allstate confirms that it retained McKinsey in the early 1990s.) Berardinelli's notes on the McKinsey slides, which he has filed in court, show that the consultants' goals were far-reaching. The objective, according to notes on one slide, was to "radically alter our whole approach to the business of claims." The consultants also advised the insurer on what steps were needed to achieve those ambitious goals.

Just why Allstate brought in McKinsey at that time isn't clear. But Berardinelli notes that in 1993, Allstate's then owner, Sears Roebuck & Co., spun off 20% of the insurer to the public and distributed the rest of the Allstate stock to Sears shareholders two years later. Freed of their ties to the large and struggling retailer, Allstate executives could now connect their personal financial fortunes directly to improvements in the insurer's bottom line. Jerry D. Choate was president of Allstate's personal property and casualty operations when McKinsey was retained, and the notes on several McKinsey slides list him as a participant in the project. Choate went on to serve as Allstate's chairman and chief executive from 1995 through 1998. By the end of 1997 he had accumulated shares worth tens of millions. He could not be reached for comment.

Allstate's "gross opportunity" if McKinsey's plan were fully implemented, according to Berardinelli's notes on one slide, was $550 million to $600 million in savings, almost all of which would come from reducing claims payments, not from cutting expenses. The consultants then targeted several areas as presenting the greatest opportunity for reductions. Fraud was one, with one slide stating that "it may exist in approximately 11 percent of current claim volume," according to Berardinelli's notes.

DRY SPIGOT

Another major focus was on "subjective" injuries, meaning claims for such things as emotional distress and pain and suffering, as opposed to "objective" injuries, such as broken limbs. To get a handle on these claims, the notes on the slides show, McKinsey worked with Allstate to install Colossus, a computerized claim-evaluation system sold by Computer Sciences Corp. (CSC ) Colossus compares a claimant's injuries with a database of similar cases and recommends a settlement range. Plaintiffs' attorneys have alleged that insurers can "tune" Colossus to consistently spit out lowball offers.

Berardinelli's notes show one McKinsey slide stating that the system has been "extremely successful in reducing severities with reductions in the range of 20% for Colossus-evaluated claims." ("Severities" is insurance industry jargon referring to the size of claim payments.) In its written response to *BusinessWeek*, Allstate says that "Colossus is merely a tool used to assist in the valuation" of some bodily injury claims and that adjusters use their expertise to come up with appropriate settlements "on each individual claim."

One of the key elements of McKinsey's plan was reducing the number of claimants who turn to attorneys after an accident for help in collecting on their insurance. The consultants even forecast what the potential gains in this area would mean for Allstate's stock. A 25% drop in attorneys appearing in several categories of cases could add $1.60 to Allstate's share price, one slide states, according to Berardinelli's notes.

The boxing gloves slide was displayed in open court in a case against Allstate in Kentucky last year. It states that by "holding the line" on cases where accident victims hire lawyers, Allstate could achieve "a new distribution of settlement times" on subjective-injury claims. "By increasing the number of early unrepresented settlements," the slide says, Allstate could give 90% of these claims the "good hands" treatment, resolving them within about 200 days. But the slide shows the remaining 10% getting "boxing gloves" treatment, and a graph shows resolution of their claims taking as much as four years or longer.

In Berardinelli's view, this slide reflects what he sees as the current practice at Allstate. Claimants in the "good hands" category may get swift reimbursement, but they will end up with less than they're entitled to, he says. Those who hold out for more -- and retain a lawyer to help them get it -- face battering in the courts and potentially years of delay. "You can get your claims resolved promptly or fairly," he argues, "but not both." Allstate says some people hired lawyers because they were not familiar with the claims process.

Once the CCPR program was rolled out in 1995, the effect was quickly felt by the trial bar. "We would ordinarily settle one or two cases a month," recalls Whitney Buchanan, a plaintiffs' attorney in Albuquerque. But then, "Allstate simply turned off the taps."

In mounting a counterattack, plaintiffs' attorneys have had some success. Courts and regulators in a number of states, including New York, Pennsylvania, and Washington, have forced Allstate to halt or change its practice of handing out a controversial "Do I Need an Attorney?" form to people involved in accidents. And Colossus, now widely used in the insurance industry, has come under attack on a

number of fronts, with attorneys alleging it is being used to lowball claims. Last year, Farmers Insurance Group, a unit of Zurich Financial Services, agreed in a nationwide settlement to stop using it for certain claims.

Loquacious and professorial-looking, Berardinelli began his quest for the McKinsey documents in a routine bad-faith suit he filed against Allstate in December, 2000, in Santa Fe County. In ordering Allstate to turn the McKinsey material over to Berardinelli, the trial judge ruled that the documents were not entitled to confidentiality but said Berardinelli had to treat them as confidential while Allstate pursued an appeal. If Allstate lost its appeal, the judge ruled, the confidentiality order would expire.

During this period, Berardinelli furiously took notes as he worked in the office of his home, perched in the southeast hills overlooking Santa Fe. The 12,500 pages -- a bit more than half of which are duplicates -- were on paper that contained background printing declaring them to be confidential.

It took two years for an interim appellate court, and then the New Mexico Supreme Court, to rule that Allstate's appeal failed because it had filed it one day too late. With the Supreme Court ruling in hand in March, 2004, Berardinelli returned the McKinsey material he had to Allstate and demanded a clean copy, free of the restrictive printing. Allstate refused, prompting the trial court judge to hit it with the most extreme civil sanction a court can order, a default judgment -- finding it liable without trial in the underlying bad-faith case.

Allstate is appealing that ruling. In a court filing, Allstate argues that Berardinelli's aim is not to have the McKinsey documents for use in a particular case but to be able to disseminate their contents to lawyers around the country. As he puts the finishing touches on his book manuscript, Berardinelli would be hard-pressed to disagree.

By Michael Orey

Advertising | Special Sections | MarketPlace | Knowledge Centers

Terms of Use | Privacy Notice | Ethics Code | Contact Us

Xerox Color. It makes business sense.

Copyright 2000- 2007 by The McGraw-Hill Companies Inc. All rights reserved.

# An insurer in the grip of greed

EXHIBIT
#8
5-29-c8
PENGAD 800-631-6989

DAVID J. BERARDINELLI

*By redesigning Allstate's claims-handling system, a consulting firm realigned the insurer's goals to satisfy shareholders at policyholders' expense. Here's an inside look at how the company abandoned its obligations to its customers.*

On June 1, 2006, Allstate Corp. Chairman and CEO Ed Liddy made a financial presentation at the annual Sanford Bernstein & Co. Strategic Decisions Conference. Speaking to an audience packed with CEOs and executives from many of the world's largest companies, Liddy proudly extolled Allstate's phenomenal financial performance since 1995, when it installed a new claims-handling system called "Claims Core Process Redesign" (CCPR).

This leap in profitability was all the more remarkable as it occurred during an unmatched parade of natural catastrophes that should have sent Allstate's profits plummeting. The CCPR system Liddy bragged about was designed by a company that many in his audience would agree was the world's most powerful corporate consultant—McKinsey & Co.

One of Liddy's presentation slides, entitled "Building a Competitive Advantage through Claims," perfectly summed up McKinsey's design philosophy for CCPR. As the system's biggest beneficiary, Liddy could personally testify to the effectiveness of McKinsey's plan to build profits through claims. Liddy was chief financial officer of Sears when it spun off Allstate in 1994. He went with Allstate then and quickly ascended to become its CEO in 1999. According to Securities and Exchange Commission filings, Liddy also amassed a personal fortune of over $150 million in stock, options, and incentive bonus-

es—all as a direct benefit of McKinsey's redesign of the insurer's claim system.

But calling in McKinsey to redesign Allstate's claim system was not Liddy's idea. It was the brainchild of Jerry Choate, the company's first CEO following its spin-off. As president of Allstate's important PP&C (personal property and casualty) business division in 1992, Choate hired McKinsey to help guide Allstate through the transition from a Sears subsidiary into a superstar performer in the insurance industry.

Choate took a hands-on approach to guiding the progress of McKinsey's redesign project at Allstate, personally approving each phase, presentation, and proposal as it moved forward. For Choate, the benefit of McKinsey's system was big and fast. Less than four years after CCPR was rolled out in 1995, he retired with a personal fortune in stock, options, and incentive bonuses estimated to be worth at least $53 million.

Under traditional principles of insurance law, insurers are supposed to give as much consideration to the interests of their policyholders as they do to their profits. McKinsey deliberately set out to introduce a new ethical paradigm.

In the mid-1990s, McKinsey partners were writing articles, books, and essays heavily promoting a new model for its corporate clients. According to McKinsey partners, the best example of this new corporate standard was its long-time client Enron. In the 1990s, McKinsey was a key architect of the strategic thinking that made Enron a Wall Street

darling—and set it on the path to its own destruction.

## A new model

Under McKinsey's model, corporate performance and ethical conduct were both measured by only one standard—the interest of the shareholder. McKinsey preached to its clients that business systems and business rules that did not promote shareholder interests were bad and needed to be changed.

A series of more than 12,000 Power-Point presentation slides that McKinsey created for a presentation to Allstate executives—which Allstate later produced under a temporary protective order in litigation[1]—show how McKinsey encouraged the insurer to secretly adopt a business strategy promoting the interests of its shareholders at the direct expense of its policyholders. In its initial CCPR presentation, McKinsey told Allstate's senior managers what would be required of them for its CCPR system to succeed: "The senior management team views the [profit] improvement program as a top priority, with unanimity in their belief that change needs to occur.... They are willing to make fundamental changes in people, procedures, management systems, structure, etc., to 'do whatever it takes' [to increase profits and shareholder value]."[2]

McKinsey's paradigm is alive and thriving at Allstate today. Its "shareholder first" business philosophy is probably best expressed in Allstate's 2006 proxy statement:

> Stock ownership requirement: Because *we believe strongly in linking the interests of management with those of our shareholders*, we first instituted stock ownership goals in 1996 for executives at the vice president level and above. These goals were increased in 2004 to require these executives to own, within five years of the date the executive position is assumed, common stock worth a multiple of base salary.[3]

Here is the ultimate example of Mc-Kinsey's paradigm at work. Allstate CEOs are required to own company stock worth seven times their annual salary. Senior management executives are required to own Allstate stock worth

four times their annual salary.

What's wrong with McKinsey's plan for the casualty insurance industry? The answer is: *everything*. Insurers are in business to make profits, but the fiduciary nature of the insurance contract prohibits insurers from "linking the interests of management with those of . . . shareholders"[4] since the shareholders' only interest is increasing profits—even at the direct expense of policyholders.

McKinsey's introduction of its business paradigm into the casualty insurance industry was fundamentally wrong. This wrong was probably best expressed almost 30 years ago by the California Supreme Court in one of the nation's landmark insurance cases:

> The insurer's obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, *where necessary placing it before their interest in maximizing gains and limiting disbursements.* . . . [A]s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries; and with the public's trust must go private responsibility consonant with that trust.[5]

## Illicit profits through claims

In 2006, Liddy had good reason to extol Allstate's post-CCPR financial performance. The company's financial improvement was just as dramatic as his own rise in personal fortune. Allstate's financial filings show that its total pretax operating income (excluding investment income) for the 10-year period before CCPR became fully operational

(1986-1995) was $820 million—an average pretax operating income of $82 million a year.

In comparison, Allstate's total pretax operating income for the 11 post-CCPR years (1996-2006) was $27.4 billion—an average pretax operating income of $2.5 *billion* per year. Compared with its pre-CCPR total operating income of $820 million, that's an almost 3,335 percent increase in total operating income in the 11 years after implementing

*Under McKinsey's business model, corporate performance and ethical conduct were both measured by only one standard—the interest of the company's shareholders.*

CCPR. That's more than phenomenal—it's downright unbelievable.

Putting this change into sports terms (on a much smaller percentage scale): It would be like a 10-year veteran of Major League Baseball who'd never hit more than 40 home runs a year suddenly putting on 30 pounds of muscle and hitting 80 home runs in the 11th year of his career. This just doesn't happen—not unless there's been some serious cheating with banned substances. It's the same for the insurance industry. Operating income increases like the ones Allstate has experienced don't just happen—not unless there's been some serious cheating with unfair claims practices. McKinsey's PowerPoint slides explain how and why the cheating occurred.

There's really only one way McKinsey could manage such a miraculous turnaround—by dramatically reducing claim payments while keeping premiums at the same or higher levels. The McKinsey slides describe this process as the foundation of CCPR, calling it the "Zero-Sum Economic Game."

McKinsey was blunt in stating the in-

DAVID J. BERARDINELLI, *author of* From Good Hands to Boxing Gloves (*Trial Guides 2006*); *practices law in Santa Fe, New Mexico.* © 2007, David J. Berardinelli.

tent behind its CCPR design: "Our change goal is to redefine the game . . . to . . . *radically alter our whole approach to the business of claims. . . .*"[6] Instead of basing CCPR on the traditional principles that restrained Allstate from solely promoting its shareholders' interest, McKinsey substituted zero-sum game theory to allow Allstate to aggressively pursue increased profits at the direct expense of its policyholders.

This approach converted claims handling at Allstate into an economics game, a direct competition between Allstate and its policyholders. As one McKinsey slide puts it: "Improving Allstate's casualty economics will have a *negative economic impact* on some medical providers, plaintiff attorneys, and claimants. . . . Zero-sum economic game—*Allstate gains—Others must lose.*"[7]

According to estimates in the McKinsey slides, the zero-sum game was intended to reduce claim payments by an average of 15 percent to 20 percent. Allstate's annual reports confirm that its phenomenal growth in pretax operating income was driven by a dramatic decrease in average claim payments.

For example, McKinsey concentrated most heavily on private auto policies in designing CCPR (although it eventually applied CCPR across the board to all casualty coverages, including homeowner's policies). In 1994, the year before CCPR was implemented, Allstate was paying out about 69 cents on claims for every premium dollar collected.[8] According to the *Wall Street Journal*, Allstate's claim payments for private passenger auto claims plunged to about 51.7 cents out of every premium dollar collected by 1998.[9]

According to the Consumer Federation of America, during the first three quarters of 2006, Allstate's overall claim

payments plunged to just 43.5 cents of every premium dollar collected—the lowest since 1987.[10] That's an additional 26.5 cents per premium dollar in "extra" profits for Allstate. As noted in the same article, Allstate's substantial reduction in claim payments should have resulted in a substantial reduction in premiums, which are based on projected payments.[11] But it hasn't.

It is clear from the slides that both McKinsey and Allstate knew that designing a claims-handling system around a zero-sum game theory would violate existing insurance laws and constitute institutional bad faith. Hence, McKinsey repeatedly refers to the need to "modify bad-faith laws" and "modify the rules and regulations [governing insurance]" for CCPR to be effective.[12]

## Abuse of the civil justice system

Although the protective order shielding the McKinsey slides has expired and Allstate has been ordered to turn the slides over to plaintiff counsel in bad-faith litigation, the company has refused to do so. (See sidebar on page 36.) It's not surprising that Allstate would willingly commit contempt of court rather than produce these slides for public dissemination—especially considering the firestorm of litigation the company provoked after denying claims made by victims of hurricanes Katrina and Rita.

Aside from the public relations disaster that would result, there's another reason Allstate isn't likely to produce the McKinsey slides without a protective order that prevents public dissemination. The slides would explain to juries—particularly in Florida, Louisiana, and Mississippi—why Allstate is deliberately forcing thousands of innocent policyholders to litigate their legitimate

homeowner claims rather than settling with them.

One of the most remarkable slides describes McKinsey's "Good Hands or Boxing Gloves" strategy—and this may be the most damning CCPR slide McKinsey created.[13] It illustrates how McKinsey applied its business paradigm to the handling of casualty insurance claims.

Under traditional insurance law, casualty insurers are required to pay legitimate claims promptly and fairly because they are bound to give equal consideration to the interests of the policyholder when handling claims. However, McKinsey's paradigm required placing shareholder interests first, and paying legitimate claims promptly and fairly would likely increase loss payouts at the direct expense of shareholders. Thus, CCPR could not be designed to pay legitimate claims both promptly *and* fairly. To win the zero-sum economic game, McKinsey designed CCPR to pay legitimate claims promptly *or* fairly, but not both.

The "Good Hands or Boxing Gloves" slide shows how McKinsey intended to win the claims economic game in two phases that deliberately and illegally exploited the economic pressures placed on a policyholder suffering from financial loss. The first phase (Good Hands) required Allstate to change how it evaluated and negotiated claims; the second phase (Boxing Gloves) required it to change how it litigated claims.

The first phase involved arbitrarily lowering Allstate's claims evaluations by using a computer program called Colossus, which was calibrated to produce evaluations at least 20 percent lower on average than Allstate's pre-CCPR claim evaluations. Allstate would require its adjusters to make nonnegotiable, take-it-or-leave-it settlement offers based on these artificially low settlement evaluations.

McKinsey estimated that, when confronted with the threat of a substantial delay in getting any benefits at all, 90 percent of policyholders would succumb within six months to the economic pressures caused by their loss and give up without a fight, accepting the low offers. These policyholders

*Operating income increases like the ones Allstate had don't just happen—not unless there's been some serious cheating with unfair claims practices.*

would get "prompt" payment—the Good Hands treatment.

The second, Boxing Gloves, phase involved a plan to deliberately abuse the civil justice system as a weapon of attrition against the estimated 10 percent of policyholders who would refuse to ac-

cept Allstate's reduced benefits. These policyholders would be driven into the "kill box"[14] of McKinsey's zero-sum economic game—the American civil justice system.

In designing CCPR, McKinsey understood from its work with other insurance

companies like State Farm that "aggressive litigation yields positive results."[15] One of McKinsey's major findings was that "Allstate doesn't aggressively use litigation *to drive down values in the market.*"[16] Thus, a key part of McKinsey's Boxing Gloves strategy would be to ac-

# How the McKinsey slides went public

Allstate's attempt to suppress any public knowledge of the damning evidence of institutional bad faith contained in the McKinsey slides has failed. Although Allstate now stands in contempt of court for refusing to obey the trial court's direct order to return or replace the McKinsey slides produced under a temporary protective order in *Pincheira v. Allstate Insurance Co.,* I personally reviewed, studied, and summarized them in detail over a period of about two years while they were in my possession during Allstate's unsuccessful appeal of the court's order.

After Allstate lost the *Pincheira* appeal and after the temporary protective order expired, I returned the original set of McKinsey slides to Allstate, even though I was under no duty to do so, believing Allstate would live up to its agreement with the court that the slides would become public if Allstate lost its appeal. I asked Allstate to replace them with a clean copy because it had placed a "restrictive overlay" on each page of the original set. Allstate refused to provide clean copies and even refused to return the originals with the restrictive overlay. When the court ordered Allstate to produce a clean set of the documents, it again refused. The court held Allstate in contempt and entered a default judgment against it on liability for its willful disobedience of its orders.[3]

During the appeal I, as plaintiff counsel, was able to study the slides and, in preparing for trial, created an extensive summary of direct quotes to serve as a searchable database of their contents. After I wrote an article about the McKinsey slides for the *New Mexico Trial Lawyers Journal,* Allstate asked for a gag order to prevent me from writing about

or publicly disclosing my knowledge of the slides' contents. When Allstate alleged I lied to the trial court about returning all copies of the original slides in my possession, I filed a copy of my summary notes in response. Allstate then filed a verified petition to seal the court file, stating under oath that my notes correctly revealed the slides' contents—which Allstate claimed were trade secrets.

The trial court denied Allstate's motions to seal the record, to prevent me from publishing articles or books about the information in the documents, and for another interim protective order. As a result, I can now publicly disseminate both my personal knowledge and summary notes about the contents of these slides. Allstate did not appeal the denial of its motions, and the summary notes are now filed as public documents in at least two cases pending in the First Judicial District Court of Santa Fe County, New Mexico.[6] The notes are also included as an addendum to my book.[7]

The McKinsey slides provide the only known record of how McKinsey and Allstate knowingly designed every CCPR protocol in favor of the interests of Allstate's shareholders (and its top executive managers/shareholders) to the direct detriment of its policyholders. One can hardly imagine a better source of evidence for an institutional bad-faith claim.

It's worth noting that McKinsey's engagement at Allstate did not end in 1996. Other records and CCPR manuals indicate that its work on improving the insurer's claims-handling processes continued after implementing CCPR. In his 2006 Bernstein conference presentation, Allstate CEO Ed Liddy stated that

work began on the "next generation of claims systems" in 2004 and was still in progress.

It seems safe to assume that McKinsey is still playing a major role in developing this next generation of CCPR. According to statements by Allstate's counsel in other cases where production of the McKinsey slides has been sought, over 20,000 slides have been created since 1992. And a recent affidavit from an Allstate vice president has now identified 127,574 pages of McKinsey documents.[8]

—DAVID J. BERARDINELLI

Notes

1. 86 P.3d 645 (N.M. App. 2004).

2. This overlay was a statement Allstate inserted in shadow print running diagonally over the original text of every page of the original set of McKinsey slides produced, stating that the documents were confidential and their dissemination prohibited by court order. This made the documents hard to read and impossible to copy or scan.

3. Default Judgment, *Pincheira v. Allstate Ins. Co.,* No. D-0101-CV-2000-2894 (N.M. Santa Fe Co. Dist. filed July 8, 2004).

4. David J. Berardinelli, *False Promises—Allstate, McKinsey, and the Zero-Sum Game,* N.M. Tr. Law. J. 93 (Aug. 2005).

5. Order Denying Defendant Allstate's Motion for Interim Protective Order Pending Appeal and for Order to Show Cause, and Motion to Seal Documents, *Pincheira v. Allstate Ins. Co.,* No. D-0101-CV-2000-2894 (N.M. Santa Fe Co. Dist. filed Feb. 22, 2006).

6. *Pincheira v. Allstate Ins. Co.,* No. D-0101-CV-2000-2894 (N.M. Santa Fe Co. Dist. Dec. 7, 2005); *Martinez v. Allstate Ins. Co.,* No. D-0101-CV-2004-0963 (N.M. Santa Fe Co. Dist. filed May 15, 2006; refiled Apr. 19, 2007).

7. David J. Berardinelli et al., *From Good Hands to Boxing Gloves* ch. 6-8 (Trial Guides 2006).

8. Aff. Christine Sullivan, in *Martinez v. Allstate Ins. Co.,* No. D-0101-CV-2004-0963 (N.M. Santa Fe Co. Dist. filed Apr. 19, 2007).

tively incite "significantly higher levels of litigation."[17]

In other words, a key part of Allstate's CCPR system involved deliberately inciting the filing of thousands of frivolous lawsuits—frivolous because they would arise not out of a legitimate dispute over claim values but because of a tactical strategy designed to encourage needless litigation. Allstate's goal: to delay or diminish payment of full value for legitimate claims.

The Boxing Gloves strategy aimed to make litigating claims against Allstate so time-consuming and expensive that any victory by the policyholder would be purely Pyrrhic. McKinsey believed that most policyholders and their attorneys would refuse to endure the expense and delay of litigation if they knew that Allstate had made an institutional decision to try every disputed claim to verdict—no matter the amount in controversy and regardless of the cost to Allstate of doing so.

Fewer policyholders and lawyers are now willing to litigate against Allstate. Their only other choice is to accept about 40 cents on the dollar for legitimate claims. The result: Allstate's shareholders win and policyholders lose. That's what "building a competitive advantage through claims" is all about. ∎

Notes

1. The protective order expired two weeks later when Allstate lost its interlocutory appeal of the trial judge's order to produce the slides without a protective order in *Allstate Ins. Co. v. Pincheira*, 86 P.3d 645 (N.M. App. 2004).

2. Initial Presentation on "Claims Core Process Redesign" 13 (McKinsey & Co. Sept. 28, 1992) (slide show) [hereinafter McKinsey Slides].

3. Allstate Corp. Proxy Statement 43 (2006) (emphasis added).

4. Allstate Corp. Proxy Statement, SEC Schedule 14A Report 26 (2005).

5. *Egan v. Mutual of Omaha Ins. Co.*, 620 P.2d 141, 146 (Cal. 1979) (citations omitted) (emphasis added).

6. McKinsey Slides, *supra* n. 2, at 5166 (emphasis added).

7. *Id.* at 1426 (emphasis added).

8. Allstate Corp. Annual Report, Schedule P 74 (2000).

9. *See* Jerry Guidera, *Colossus at the Accident Scene*, Wall St. J. C1 (Jan. 2, 2003). *See also* Allstate Corp. Annual Report, Schedule P (2004) (showing private passenger auto net premiums and loss payments). *Cf. Twentieth Annual Sanford Bernstein Strategic Decisions Conference* 20 (presentation on Allstate Corp.'s financial performance by Edward M. Liddy, Chairman, President, and CEO June 3, 2004) (slide show) (graph showing Allstate's "statutory" combined ratio—meaning loss costs plus all claim expenses—consistently below the insurance industry average from 1996, the first full year of CCPR, through 2003).

10. J. Robert Hunter, *Property/Casualty Insurance in 2007: Overpriced Insurance, Underpaid Claims, Declining Losses and Unjustified Profits* 5 (Consumer Fedn. of Am. 2007).

11. *Id.*

12. McKinsey Slides, *supra* n. 2, at 2929, 4216.

13. *Id.* at 3172.

14. A military tactical term indicating a coordinated plan of attack for air and ground forces in which all enemy targets in a designated geographic area are systematically attacked and destroyed. *See* Lt. Col. Karl E. Wingenbach, *Kill Box—The Newest FSCM*, at 1-2, http://sill-www.army.mil/FAMAG/2005/JUL_AUG_2005/PAGES13_15.pdf (July-Aug. 2005).

15. McKinsey Slides, *supra* n, 2, at 4964.

16. *Id.* at 12101 (emphasis added).

17. *Id.* at 6325.

