# Exhibit 4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

PAMELA ARMISTED, as Guardian of

JONATHAN BOYCE, KATHLEEN CHAUVIN,

As Guardian of JOSEPH CHAUVIN,

JERRY WAGNER, as Guardian of

LESLIE STEWART, EILEEN ADAMS, as

Guardian of JOSHUA ADAMS, HAROLD

ADAMS and GARY PARKS, as Guardian of

TOWANDA PARKS.

            Plaintiffs,

-vs-                        Civil Action No. 2:07-cv-10259

STATE FARM MUTUAL AUTOMOBILE          Hon. Arthur J. Tarmow

INSURANCE COMPANY, an Illinois

Corporation,

            Defendants.

_____/

      DEPOSITION OF:   WENDY ROGERS

Page 2

July 15, 2008(Title page continued)

The deposition of WENDY ROGERS, a witness in the above-entitled cause, taken before Merle Bassin, CSMR 2237, Court Reporter and Notary Public in and for Oakland County, Michigan (acting in Bloomington, Illinois), at 10 Brickyard Drive, Bloomington, Illinois, Michigan, on the 15th day of July, 2008, commencing at 10:00 a.m. pursuant to the Michigan Court Rules and the Rules of Federal Procedure.

Page 4

INDEX

Page

Direct Examination by Mr. Andrews                  4

Exhibits

Plaintiff's Deposition Exhibit Number 1            46

Notice of Deposition

Plaintiff's Deposition Exhibit Number 2            85

Original Deposition Notice

Plaintiff's Deposition Exhibit Number 3            139

August 8, Copy of Auto Claim Manual
And other documents

Plaintiff's Deposition Exhibit Number 4            173

Complaint

Plaintiff's Deposition Exhibit Number 5            176

Commitment to Policy Attorney Leaks

Plaintiff's Deposition Exhibit Number 6            241

Work Load

Page 3

APPEARANCES:
LISS, SEDER, and ANDREWS
    39400 Woodward Avenue, Suite 200
    Bloomfield Hills, Michigan 48304
    By:  NICHOLAS ANDREWS
    For the Plaintiff

HACKNEY, GROVER, HOOVER, AND BEAN
    3514 Rivertown Point Court, Suite B
    Grandville, Michigan 49418
    By:  RICHARD GROVER
    Attorney for Defendant

Page 5

July 16, 2008

                    Bloomington, Illinois
                    At or About 10:00 a.m.

VIDEO TECHNICIAN:  We are on the record.  This is the videotape deposition of Wendy Rogers being taken on July 15th, 2008.  The time is now 10:21 a.m.  My name is Ernest Herkeim (phonetic), video technician.  Can the attorneys state appearances for the record, please?

MR. ANDREWS:  Nicholas Andrews and Arthur Liss on behalf of the plaintiffs.

MR. GROVER:  Uh, Rick Grover on behalf of the defendant.

VIDEO TECHNICIAN:  Can the court reporter please swear in the witness?

WENDY ROGERS,
having been first duly sworn to tell the truth was examined and testified as follows:

            DIRECT EXAMINATION
BY MR. ANDREWS:
Q.   Would you please state your name?
A.   Wendy Rogers.
Q.   Ms. Rogers, we introduced ourselves before the deposition began.  But again, my name is Nick Andrews and seated next to me is Arthur Liss.  And as you probably know, we represent the plaintiffs in the litigation of, uh, Pamela

Page 238

Q. Who is that?

A. James Mathis was a team manager in the Pacific Northwest. And he, uh, worked, I believe, in the estimatics area. And he left State Farm shortly after I was supporting them as a consultant.

Q. Oh, okay. Because you -- you were in the Pacific Northwest --

A. Yes, I was.

Q. -- region, it wasn't a zone at that time?

A. Right, it was a region.

Q. Did you ever have any contact with him?

A. I never spoke to James Mathis myself.

Q. Have you ever been asked that question before in a deposition?

A. If I knew of him?

Q. Yeah.

A. Yes.

Q. Okay. Um, do you know when?

A. Um, no, I don't.

Q. Okay. Um, so you didn't have any direct contact with him?

A. No, I don't think he would know who I was and I don't know if I would recognize him.

Q. Okay. Do you know what the, uh, attendant care tool is? Have you ever heard that phrase before?

A. I've never heard that phrase before.

Page 239

Q. Do you know if within the Great Lakes Zone and Michigan in particular, if State Farm has any specific policies and procedures as to how to handle a claim in which family provided attendant care is being claimed?

A. I don't know.

Q. Did you ever deal with the issue of family provided attendant care as an auto claim consultant for Michigan?

A. I don't -- I don't say it is deal with the issue. I think it's a topic that I've been in discussion with perhaps on a file. But --

Q. Um, you mean a particular file as opposed to in general?

A. Yes, yes.

Q. During these quarterly meetings, do you have any recollection of having general discussions regarding, um, attendant care or family provided attendant care benefits?

A. No, I don't.

Q. Does State Farm retain any documents that are associated with any internal seminars that are given?

A. I don't know what the specific guidelines are on that.

Q. Would that be a question for, uh, record retention that we talked about earlier?

A. Yes, someone that knows that policy well might be able to answer that.

Q. All right. Um, have -- have you ever, um, heard of a seminar at State Farm called negotiations for a claim

Page 240

professional?

A. Yes.

Q. Um, in what context have you heard of that?

A. I taught it.

Q. Oh, okay. Um, is that something that is retained on the Intranet?

A. I don't -- I don't -- I don't know if that's still even an active course. I -- I taught it to, uh, claim representatives when I was in New York that were working with the B I claims, and that would be 20-some years ago.

Q. You don't know if it's something that, uh, still exists?

A. I don't know if it still exists.

(Whereupon Plaintiff's Deposition Exhibit Number 6 was marked by the Court reporter.)

BY MR. ANDREWS:

Q. Let me show you what I've marked as Exhibit Number, uh, 6.

A. Okay.

Q. Do you recognize that document?

A. Vaguely. There are -- there are pieces of it that I do recall, yes. I have to say after 25 years or what have you.

Q. Saying after 25 years that you have a good memory or?

A. Yes.

Q. Um, so you do recognize portions of Exhibit Number 6,

Page 241

which for the record, are four pages. And as being part of the, uh, negotiation for the claims professional course that you taught?

MR. GROVER: Objection, she said it was a third party negotiation session. So, object, form and foundation. Go ahead.

THE WITNESS: To my knowledge, that -- that course was overhauled, rewritten, updated on numerous occasions. So some of that information appeared in the course that I taught. But I don't -- I couldn't say verbatim if that's out of the particular course that was delivered at that time. I -- I don't know.

BY MR. ANDREWS:

Q. Well, let's -- let's go through and see what might be familiar to you and --

A. The fundamentals are there, list and exchange information, agree, disagree.

Q. How about it's often said that we negotiate from a position of strength, control flows out of our power position not bombast?

A. I can't say that I remember the word bombast.

Q. I don't know what bombast means, so.

A. I don't either, so that's why I don't think I know that paragraph.

Q. How about the control flows out of our position of power?

Page 242

That -- that sounds familiar to you?

A.   Yeah, something along those lines.

Q.   Okay.  Um, uh, on the first page of Exhibit Number, uh, 6 -- well, I'm going to identify the page as N12 because that's what is at the bottom.  It also says power's ability to control.  You recall that from the --

A.   Fundamentally, yes.

Q.   Okay.  Um, it also says I read this statement somewhere and I wonder how you react to it, question mark.  And then it says suggested responses.  It's only in the head of the person to whom you relate.  Bullet point two, power doesn't last for any extended period of time.  Bullet point number three, power is mysterious and bullet point number four, power seems to derive from a lot of externals.

Does that sound familiar to you as being part of the course?

A.   Roughly, yes.

Q.   Okay.  Um, again on page N12, you can never foretell what any one individual will do but you can predict with surprising accuracy what the average attorney will do.  Does that sound familiar?

A.   That does not sound familiar.

Q.   Okay.  I'm going to page N13.  Um, it says at the top, has anyone heard of the 80/20 rule.

Page 243

A.   I've heard -- yes, I've heard that.

Q.   What's the 80/20 rule?

A.   What I just read there was 80 percent of the -- it said something about sales people or something?

Q.   Yeah, you know what, and -- and let's go through that.  Maybe that will help to answer the question.  It says a man by the name of, uh, Pareto, P-a-r-e-t-o, propounded the rule that says 80 percent of sales come from 20 percent of salesman, 80 percent of sales come from 20 percent of the customer, 80 percent of value is in 20 percent of inventory, 80 percent of action occurs in the last 20 percent of the time available.

A.   Yeah, very profound.

Q.   You agree with that?

A.   Not necessarily, but.

Q.   Okay.  Is 80 percent of our action come into place in the last 20 percent of this deposition?

A.   I don't know.

Q.   Okay.  Um, it also goes on to say since negotiation is an art form, not a science, we play percentages.  Do you recall that from the course?

A.   Uh, I recall saying that it was an art.  I don't remember the percentages there.

Q.   Okay.  The -- the next statement, you should be able to predict reaction and outcome with over 80 percent

Page 244

accuracy.  Do you recall that as being part of the course that you taught?

A.   Something similar to that.

Q.   Okay.  Also on this page, N13, the statement we need to be aware of the power we have?

A.   Something along those lines, yes.

Q.   Okay.  Um, and then there are three bullet points.  Legitimacy, the public recognizes the inate, power of the --

A.   Insurance company.

Q.   Thank you, insurance company and response instinctively to its dicta just as it does with a, and quote, stop sign, close quote.  Do you remember that?

A.   I don't remember that exact example but something that was conveying that message, yes.

Q.   Okay.  The next one says question or hyphen, the person doing the questioning relegates to himself automatic power.

A.   Yes.  How does it feel?

Q.   You said that to your attorney, that would be me.  I'm relegated to the automatic power of the position -- in the eyes of State Farm.  Is this part of the course that you taught?

A.   Yes.

Q.   Okay.  Um, it says position, hyphen the "she/he", who has

Page 245

control of the dollars is in a position of power.  Is that a part of the course that was taught by you?

A.   That, I don't recall.  Um, when I teach a class or a course, I use the material more as a guide.  So I may or not read verbatim from something like that, so.

Q.   Okay.  You -- your -- how many years did you teach that course?  Was that just in New York?

A.   Uh, I've never taught it in places such as New York.

Q.   Okay.  And, uh, you were in New York in the 80s?

A.   70s and 80s, and part of the 90s.

Q.   Okay.  Was this a PowerPoint presentation of some sort?

A.   No, we didn't have PowerPoint's then.

Q.   I was thinking that --

A.   Yeah, nice try, though, but at least not until the late 90s.

Q.   Okay.  Um, well let's go onto page N14.  It says knowledge, hyphen, the claim rep who has superior knowledge of the law -- these are bullet points, details of the accident, uh, coverage, attorney leaks, verdict range and experience possesses the greater power.  Was that a part of the course that you taught?

A.   The fundamental concept, yes.

Q.   What are attorney leaks?

MR. GROVER:  Don't guess or speculate --

THE WITNESS:  I can't.  Nothing comes to mind.

Page 246

I can't remember.

BY MR. ANDREWS:

Q. It's not like the McKenzie and Company leakage stuff or?

A. No.

Q. Okay.

A. Not that I remember.

Q. All right. Um, going on in page N14 of Exhibit Number 6, uh, these are bullet points again. Time height and it's always a power advantage to choose the precise time for interaction and negotiation because preparation is strength. Is that part of the course that you taught?

A. Yes.

Q. Silence, when we are interacting prolonged silence on the part of one of the parties will make the other real nervous.

A. Yes.

Q. Yes, meaning that was part of the course?

A. Yes, that was part of the course.

Q. You're not feeling nervous doing this, are you?

A. No.

Q. Competition, the claim rep can derive power by a subtle reminder of how, in quotations, "other attorneys operate", the need to belong is very strong. Is that a part of the course?

A. I don't remember that specifically.

Page 247

Q. Okay. Because I was going to ask if you knew what that meant.

A. I don't remember.

Q. All right. Uh, reward and punish the claim rep has the power to pay or deny was part of the course, right?

A. I don't remember the word punish being in any of the course that I taught. It doesn't sound like a word that State Farm would really want in their training material.

Q. Okay. But certainly the claim rep has the power to pay or deny, that was --

A. A claim representative makes those decisions, yes.

Q. Okay. Um, effort, energy and action are the -- the investments of power? Does that sound familiar?

A. Could be -- and you know, that particular course is not -- was not a State Farm course. That was a purchased course from some other outfit. We didn't write that.

Q. You didn't write it?

A. No.

Q. But State Farm taught it?

A. We -- we bought it and to my understanding -- so that's why a lot of times I think for me I would use that kind of as a guideline.

Q. Okay.

A. So, I wouldn't necessarily agree with all the things that were in there.

Page 248

Q. Okay. Um, personal ambition going through the other bullet point. It cannot be masked and it signals to drive the translate into power. Is that a part of the course that you taught?

A. Something along those lines, yeah.

Q. Okay. And then negotiating skills, attorneys who will attempt to take more negotiation liberties with the unskilled. Was that, too, a part of the course?

A. Yeah, I think so. The classes that I taught were to litigation reps that were handling third party lawsuits in the suit unit in Metro New York. So, they were dealing only with attorneys.

Q. Oh, okay. All right.

A. So --

Q. Um page M15, here are some power principles that will work for you most of the time colon, bullet points, three of them. If you are in a position of power, use it. Do you recall that as being part of the course --

A. Yes.

Q. If you are in a position of no power, delay. Do you recall that as well?

MR. GROVER: Don't guess or speculate --

THE WITNESS: No, I don't recall that.

BY MR. ANDREWS:

Q. Okay. With power and expectation erode with time.

Page 249

A. Don't recall that either.

Q. Um, the process of negotiation is as follows, colon, bullet point; there is an exchange of information. Bullet point, the development of expectations and bullet point, agreement on settlement. Do you recall that as being part of the --

A. That's very close, yes.

Q. Okay. Um, and then finally on page N15, attorneys usually have a well-developed set of expectations that they bring to every negotiation. The satisfaction of these needs is vital, colon: some of the more common ones, colon, the need to, colon, bullet point, feel competent, bullet point, avoid risks, bullet point, look good, bullet point, relief from detail, bullet point, get it over with and bullet point, consider it fair.

Is that what you recall that as being a part of the course that you taught?

A. A couple of those I do recall.

Q. Which ones?

A. Um, be considered fair and there's something in there about coming prepared to the table.

Q. Okay. All right. How many other classes did you teach at State Farm during your 34 -- if I have that right, 34 and a half years?

A. There's been a few over the years for various reasons.

Page 250

Um, in the Metro New York area a lot of the leadership taught classes. And again, we didn't really have a training department so to speak.

Q. Um, these days is the training -- and I don't -- you said it was unorganized at those times. But is it -- is it more organized, more centralized now?

A. Yes, we -- I mean the company has a learning development department.

Q. The learning and development department is not, um, was not a part of the company, it was not in existence when -- when you were back in New York?

A. We had one then but it was, um, I guess for lack of a better word, it was unorganized.

Q. Okay.

A. It's not as formalized as it is now.

Q. Okay. Would the learning and development department also be a department that we should look to, to -- in addition to record retention to find out where the training documents are and things of that nature?

A. The learning and development department really works on a lot of these that are not necessarily training. And that's why it's development and not training.

Q. Okay.

A. Development, uh, a large portion of that department is on development of people skills and the development for

Page 251

people to move into other positions. So, it's more personal development, growth development, leadership development.

Q. Okay.

A. Um, they do the learning part, you know, we have people -- we have claim representatives attend a claim school. They have -- they teach claim school.

Q. Okay. That's a two-week course in Bloomington?

A. I don't even know how long it is anymore.

Q. Okay. Um, you went through that, did you?

A. I did go through it, yes, my first trip to Bloomington.

MR. GROVER: 30 years ago.

THE WITNESS: Yeah.

BY MR. ANDREWS:

Q. Did you read the Illinois insurance policy back then, too?

A. No, it was the Indiana policy.

Q. Indiana policy, okay.

A. Yes.

MR GROVER: Get it over with.

MR. ANDREWS: You know what?

THE WITNESS: What?

MR. ANDREWS: We're done. We're getting it over with. Thank you for your time here today.

THE WITNESS: Oh, thank you.

VIDEO TECHNICIAN: We're ending this

Page 252

deposition. The time is 6:50 p.m.

(Deposition concluded at 6:51 p.m.)

Page 253

CERTIFICATE OF NOTARY PUBLIC

STATE OF MICHIGAN     )
                                    )SS
COUNTY OF OAKLAND     )

I, MERLE BASSIN, a Notary Public within and for the County of Oakland, State of Michigan, do hearby certify that the witness whose attached deposition was taken before them in the entitled cause, was sworn to testify the truth, the while truth and nothing but the truth; that the testimony contained in said deposition was taken by me by means of Stenomask; that said deposition was thereafter reduced to written form and that the said deposition is a true and correct transcript of the testimony given by said witness. I do further certify that I am not connected by blood or marriage to any of the parties, or their attorneys or agents; that I am not an employee of any of them; nor am I interested directly or indirectly in the matter or controversy either as counsel, agent, attorney or otherwise.

IN WITNESS WHEREOF I have hereunto set my hand at West Bloomfield, Michigan, County of Oakland, State of Michigan.

_____

MERLE BASSIN, CSMR-2237

65 (Page 254)

Page 254

Notary Public, Oakland County, Michigan
My Commission expires